AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY YAHOO INC. PURSUANT TO 18 U.S.C. 2703 FOR AN INVESTIGATION OF VIOLATION OF 18 U.S.C. §§ 371 | ) ) ) ) ) ) )     Case No.    24-sc-657 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, hereby incorporated by reference.

located in the jurisdiction of the _____ District of Columbia _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C.§ 666 (theft or bribery concerning programs receiving federal funds), 18 U.S.C. § 1001 (false statements), 18 USC § 1014 (false statement - loan and credit applications generally), 26 USC § 7206 (aiding and assisting in the preparation of false tax returns), 18 USC § 1343 (wire fraud), 18 USC § 1344 (bank fraud), and 18 USC § 371 (conspiracy) | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Garret S. Churchill, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone _____ *(specify reliable electronic means).*

Date:   3/28/2024

_____
*Judge's signature*

City and state:   _____ Washington, D.C. _____

The Honorable Moxila A. Upadhyaya
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the Search of | ) |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY YAHOO INC. PURSUANT TO 18 U.S.C. 2703 FOR AN INVESTIGATION OF VIOLATION OF 18 U.S.C. §§ 371 | ) ) ) ) ) ) Case No.   24-sc-657 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Jurisdiction of the_____ District of _____Columbia_____

*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____April 11, 2024_____ *(not to exceed 14 days)*
in the daytime 6:00 a.m. to 10:00 p.m.  ✓ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Moxila A. Upadhyaya_____ .
*(United States Magistrate Judge)*

Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
for _____ days *(not to exceed 30)*     until, the facts justifying, the later specific date of _____ .

Date and time issued:      3/28/2024_____          _____
                                                                                                          *Judge's signature*

City and state:      Washington, DC_____          Moxila A. Upadhyaya, United States Magistrate Judge
                                                                                              *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>24-sc-657 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

<u>**ATTACHMENT A**</u>
**Property to Be Searched**

This warrant applies to information which is associated with the Yahoo Inc. account identified by antoniette.taylor@yahoo.com, and which is stored at premises owned, maintained, controlled, or operated by Yahoo Inc., a company that accepts service of legal process at 391 San Antonio Road, Floor 5, Mountain View, CA 95040.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.     **Information to be disclosed by Yahoo Inc. ("PROVIDER") to facilitate
execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, including any records that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

a.     For the time period April 1, 2018 to present: The contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services), including but not limited to incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic communications; attachments to communications (including native files); source and destination addresses and header or routing information for each communication (including originating IP addresses of e-mails); the date, size, and length of each communication; and any user or device identifiers linked to each communication (including cookies); electronic communication services; web browsing and search tools such as Yahoo Search (internet searches), and Web History (bookmarks and recorded browsing history).[6]

---

[6] Yahoo provides e-mail, contact list, notes, chat, and other services as noted generically above. It provides the branded services Yahoo! groups (a listserv and bulletin board service, which users can opt into), and Yahoo! Messenger (an instant messaging service, which users can opt into). Yahoo does not currently provide a standalone document storage service, but its smartphone application has designated "documents" functions that operate through Yahoo's e-mail storage.

b.      For the time period April 1, 2018 to Present: The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as email services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information), and all other services referenced in paragraph (a);

c.      For the time period April 1, 2018, to present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies) including Yahoo Search;

d.      For the time period April 1, 2018, to present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information,

and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account;

g.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (e.g., credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.      For the time period April 1, 2018, to present: All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information

pertaining to nearby devices, Wi-Fi access points, and cell towers;

      i.     For the time period April 1, 2018, to present: All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

      j.     Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel); and

      k.     Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above, preferably in electronic format, via United States mail, courier, or e-mail to the following:

Special Agent Garrett S. Churchill
Federal Bureau of Investigation
Washington Field Office
601 4th Street NW
Washington, DC 20535
Email: gschurchill@fbi.gov
Phone: 202-440-0195

[Remainder of Page Intentionally Left Blank]

## II.                Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of (a) Title 18, United States Code, Sections 371, 666, 1001, 1014, 1343, and 1344, and (b) Title 26, United States Code, Section 7206, as described in the affidavit submitted in support of this Warrant, including, for the Target Account, information pertaining to the following matters:

a.    Information that constitutes evidence of the identification or location of the user(s) of the Target Account;

b.    Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Target Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

c.    Information that constitutes evidence indicating the Target Account users' state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

d.    Information that constitutes evidence concerning how and when the Target Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Target Account user;

e.    Information that constitutes evidence concerning violations of Title 18, United States Code, Sections  371, 666, 1001, 1014, 1343, and 1344, and (b) Title 26, United States Code, Section 7206;

f.      Records regarding the sending and receiving of business records, incorporation records and certificates, payroll records, employment applications, employee records, Forms W2, Forms W4, and Forms 1099, as well as any and all records notating cash payments.

g.      Federal, State, or City Income or Payroll Tax Returns and related correspondence and supporting documents.

h.      Prepared income tax returns.

i.      Work papers relating to the certification, preparation, and/or accumulation of financial data and tax returns.

j.      Bank statements, cancelled checks, check stubs, duplicate checks, check books, check authorization documents, check registers, deposit slips, wire transfers, letter instructions regarding transfers of funds, bank notices, credit memos, certificates of deposit, money orders, trust account records, and records reflecting any cash receipts and cash disbursements, safe deposit box records and keys.,

k.      Records related to the disposition of the PPP Loan proceeds.

l.      Records related to any contracts and grants won by the companies to include applications, supporting materials, invoices, statements of work, status and completion reports, budgets, and cost itemizations.

m.      Electronic correspondence and correspondence in any format relating to the items described above including violations of Title 18, United States Code, Sections, 371, 666, 1001, 1014, 1343, and 1344, and (b) Title 26, United States Code, Section 7206.

n.     Correspondence in any format relating to WMATA, EMPOWERMENT BUSINESS CONSULTING, the WMATA Office of Surplus Property, surplus property that was owned or for sale by WMATA, HUNTER, business transactions involving HUNTER, business transactions involving WMATA, WMATA property subject to sale by the Office of Surplus Property, the purchase and/or sale of buses, business transactions with scrapyards, and/or the payment or receipt of funds relating to WMATA surplus property and/or scrapped property.

**III.        Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

[Remainder of Page Intentionally Left Blank]

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY YAHOO INC. PURSUANT TO 18 U.S.C. 2703 FOR AN INVESTIGATION OF VIOLATION OF 18 U.S.C. §§ 371 | SC No. 24-sc-657 |

*Reference: USAO Ref. # 2022R02017; Subject Account:* **antoniette.taylor@yahoo.com**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Garrett S. Churchill, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application for a search warrant for information which is associated with one Yahoo Inc. account – that is, the account identified by the e-mail address **antoniette.taylor@yahoo.com (**the **"TARGET ACCOUNT")** which is stored at premises controlled by Yahoo Inc. ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at / which accepts service at 391 San Antonio Road, Floor 5, Mountain View, CA 95040. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures

described in Section III of Attachment B.

2.  I am a Special Agent with the Federal Bureau of Investigation ("FBI"), Washington Field Office. I have been in this position since September 2019 and am currently assigned to investigate criminal matters in the District of Columbia. My primary responsibilities include conducting investigations involving public corruption, complex financial fraud, fraud against the government, and other related violations of federal criminal law. During my training at the FBI Academy, Quantico, Virginia I received training in a variety of investigative and legal matters, including physical surveillance, legal statutes and procedures, Fourth Amendment searches, the drafting of search warrant affidavits, probable cause, and digital forensic data analysis. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States. I have planned, led, and participated in multiple search warrants related to federal criminal violations involving fraud and public corruption during my tenure at the FBI's Washington Field Office. Prior to my appointment as a Special Agent, I was engaged in the private practice of law for nine years.

3.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants. It does not set forth all my knowledge, or the knowledge of others, about this matter. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements.  The dates and times listed in the affidavit are approximate.

4.  Based on my training and experience and the facts as set forth in this affidavit, I

respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 666 (theft

or bribery concerning programs receiving federal funds), 18 U.S.C. § 1001 (false statements), 18 USC

§ 1014 (false statement - loan and credit applications generally), 26 USC § 7206 (aiding and assisting

in the preparation of false tax returns), 18 USC § 1343 (wire fraud), 18 USC § 1344 (bank fraud), and

18 USC § 371 (conspiracy), (collectively, the "SUBJECT OFFENSES") have been committed by

ANTONIETTE TAYLOR. There is also probable cause to search the information described in

Attachment A for fruits, contraband, evidence and instrumentalities of these crimes, as further

described in Attachment B.

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is a "court of

competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and

(c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction

over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below,

acts or omissions in furtherance of the offenses under investigation occurred within Washington,

D.C. *See* 18 U.S.C. § 3237.

## STATEMENT OF FACTS SUPPORTING PROBABLE CAUSE

### *Background*

6. This search warrant application is being filed in connection with an ongoing

investigation into criminal acts committed by TAYLOR and her then-boyfriend, TYRONE

HUNTER ("HUNTER"). TAYLOR was formerly an information technology (IT) services

contractor employed by the Department of the Navy in the metropolitan Washington, D.C. area.

HUNTER is an Investment Recovery Administrator ("IRA") employed at the Washington

Metropolitan Area Transit Authority (WMATA) Office of Property Reutilization and Disposition

Services (the "Office of Surplus Property"). WMATA headquarters are located within Washington, D.C.  The Office of Surplus Property is a WMATA facility located in Landover, Maryland.

7.  The ongoing investigation has thus far revealed evidence of violations of 18 U.S.C. § 666 (theft and bribery concerning programs receiving Federal funds), and 18 U.S.C. § 371 (conspiracy) committed by TAYLOR and HUNTER as part of two separate schemes: (a) TAYLOR and HUNTER participated in a conspiracy to steal property from WMATA and convert it to the personal benefit of HUNTER and TAYLOR, in violation of 18 U.S.C. §§ 371 and 666(a)(1)(A); and (b) HUNTER extorted customers of the Office of Surplus Property and solicited and accepted bribes from those customers in exchange for being induced to do or omit to do any act in violation of his official duties as a WMATA employee, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 1951.  The investigation further identified evidence that TAYLOR facilitated at least two bribe payments to HUNTER from a WMATA customer.

8.  With regard to the theft scheme, HUNTER, as part of his official WMATA duties and in conspiracy with TAYLOR, stole property from WMATA, specifically, decommissioned WMATA transit buses that had been sent to the Office of Surplus Property for disposition. HUNTER engineered the sale of these buses on multiple occasions to TAYLOR at approximately one third to one half of their scrap metal value. HUNTER signed over the titles to many (but not all) of these vehicles to TAYLOR in advance of any payment or sale paperwork to TAYLOR, despite a WMATA policy that requires payment in full prior to removal of property and transfer of title of any surplus property. HUNTER then permitted TAYLOR to take the buses from WMATA's custody (via tow truck) prior to TAYLOR paying WMATA for the buses or completing any sales paperwork.  TAYLOR then scrapped these buses and deposited cash from

this property into a bank account controlled by TAYLOR. After TAYLOR had already scrapped a significant portion of the WMATA buses, HUNTER and TAYLOR prepared falsified, backdated WMATA sales paperwork for the already-scrapped buses. This paperwork set the sales "price" for the buses after many of the buses had already been scrapped and the profits were already known to HUNTER and TAYLOR, thereby allowing them to ensure that the amount of money TAYLOR paid to WMATA per bus maintained a significant profit margin for HUNTER and TAYLOR; indeed the "price" listed in the backdated paperwork per bus was roughly equal to one third to one half of the value received by TAYLOR from the scrapping. Essentially, HUNTER and TAYLOR conspired to take property from WMATA without paying for it, scrapped the property for cash, and then used a portion of the cash to "purchase" the assets from WMATA after the fact. HUNTER and TAYLOR then covered up this scheme through falsified, backdated WMATA sales paperwork to portray the transactions as routine and keeping with WMATA policies.

9.  With regard to the bribery scheme, the acts in violation of HUNTER's official duties included the following, among other things: (a) awarding surplus property to bribe-paying customers in negotiated sale transactions at favorable prices; and (b) providing bribe-paying customers special access to Office of Surplus Property materials for sale that was not afforded to other customers.

10.  HUNTER's bribery scheme was aided and abetted by TAYLOR, who served as a "cut-out" to accept at least two bribe payments from HUNTER's customers on HUNTER's behalf and at HUNTER's direction. These payments took the form of money orders, checks, and Cash App transactions. It is believed that TAYLOR's involvement as a payment recipient in these transactions was intended by HUNTER to obscure the existence and nature of the bribe payments

that were ultimately intended for HUNTER.

11.   The ongoing investigation has resulted in the issuance of five prior search warrants from the U.S. District Court for the District of Maryland that authorized searches of: (a) the persons of HUNTER and TAYLOR; (b) a vehicle associated with HUNTER; (c) an apartment rented by HUNTER; and (d) a condo unit rented by TAYLOR and utilized by both TAYLOR and HUNTER as a residence.[1] Generally, these five warrants authorized the search of the persons and property listed for documentary evidence and communications, including cellular devices and physical records, containing fruits, contraband, evidence and instrumentalities of the federal criminal violations described in the preceding sentences.

12.   The execution of the aforesaid warrants resulted in the seizure of a cellular device utilized by TAYLOR (the "TAYLOR PHONE") and multiple cellular devices utilized by HUNTER, including a phone registered to HUNTER that was used to correspond with TAYLOR (the "HUNTER PHONE"). These cellular devices were reviewed and forensically examined by investigators pursuant to the terms of the warrants that authorized the seizure of these devices.

13.   During forensic examination of the TAYLOR PHONE, your affiant became aware that TAYLOR had utilized the TARGET ACCOUNT to send communications related to the scheme to steal WMATA surplus buses that is explained above. Additional review of the TAYLOR PHONE further revealed that TAYLOR had used the TARGET ACCOUNT to communicate about, and/or to facilitate the commission of, additional criminal activity unrelated to the embezzlement and bribery schemes previously outlined herein.

14.   Specifically, evidence indicating TAYLOR's involvement in the following additional

---

[1] These warrants were issued by Hon. Gina L. Simms, United States Magistrate Judge, United States District Court for the District of Maryland (Greenbelt) in April 2023. See case numbers 8:23-mj-01191-GLS (person of HUNTER), 8:23-mj-01192-GLS (person of TAYLOR), 8:23-mj-01193-GLS (HUNTER's vehicle), 8:23-mj-01194-GLS (apartment unit rented by HUNTER), and 8:23-mj-01195-GLS (condo unit rented by TAYLOR and utilized as a residence by TAYLOR and HUNTER).

criminal activity, separate and apart from her schemes involving HUNTER, was identified by review of the TAYLOR PHONE and confirmed in debriefing sessions held between TAYLOR, TAYLOR's attorney, and members of the investigative team (including your affiant). This evidence is described below and included evidence that TAYLOR had used the TARGET ACCOUNT to facilitate the commission of her criminal activity, as well as to communicate with co-conspirators about said activity:

    a. TAYLOR used the TARGET ACCOUNT to correspond with HUNTER related to her Office of Surplus Property transactions, and allegedly to submit bids to WMATA that were a cover up for a scheme in which HUNTER unlawfully provided the titles to multiple WMATA-owned transit buses to TAYLOR, prior to TAYLOR paying for the buses; TAYLOR then scrapped the buses for cash, and used a portion of the cash to "pay" for the purchase of the destroyed buses at a later date, which was documented as the sale date in WMATA paperwork despite the fact that the buses being purchased and paid for on the sale date by TAYLOR had already been destroyed and converted into cash that was deposited into TAYLOR's bank account, in violation of 18 U.S.C. § 666 (theft or bribery concerning programs receiving Federal funds), and 18 U.S.C. § 371 (conspiracy);

    b. TAYLOR filed multiple Small Business Administration (SBA) Paycheck Protection Program (PPP) loan applications on behalf of co-conspirator recipients that contained fraudulent information in return for a kickback from the fraudulent loan proceeds received by the recipient, in violation of 18 USC § 1001 (false statements), 18 USC § 1014 (False statement - loan and credit

applications generally), 18 USC § 1344 (bank fraud) and 18 USC § 371 (conspiracy to commit offense or to defraud United States), and used the TARGET ACCOUNT to communicate with co-conspirators about the scheme;

c.  TAYLOR aided and assisted the preparation of false tax returns on behalf of co-conspirator recipients in return for a kickback from the fraudulent tax return proceeds received by the recipient, in violation of 26 USC § 7206 (aiding and assisting in the preparation of false tax returns) and 18 USC § 371 (conspiracy to commit offense or to defraud United States), and used the TARGET ACCOUNT to communicate with co-conspirators about the scheme; and

d.  TAYLOR aided and assisted in the preparation of false unemployment benefit claims on behalf of co-conspirator recipients in return for a kickback from the fraudulent unemployment benefit proceeds received by said recipients, in violation of 18 USC § 1343 (wire fraud) and 18 USC § 371 (conspiracy to commit offense or to defraud United States), and used the TARGET ACCOUNT to communicate with co-conspirators about the scheme.

15.  On September 29, 2023, a federal grand jury in Washington, D.C. returned an indictment in case number 1:23-cr-3440-JMC that charged HUNTER with two counts of federal program bribery and two counts of extortion of WMATA surplus property customers, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 1951.  On November 14, 2023, the grand jury returned a First Superseding Indictment against HUNTER and TAYLOR that added charges against both of them concerning the bus theft scheme, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 371.  On December 21, 2023, the grand jury returned a Second Superseding Indictment that added federal

program bribery and extortion charges against HUNTER, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 1951.

### *Evidence of Probable Cause*

16.   The investigation to date, conducted by the FBI Washington Field Office (FBI-WFO) and the WMATA Office of Inspector General (OIG), began in August 2019 when WMATA OIG agents reported to FBI-WFO allegations made by multiple customers of the Office of Surplus Property over a period of several years that HUNTER had been soliciting and accepting bribes in return for directing favorable deals on the sale of used/surplus WMATA property to said customers. HUNTER's job duties at the Office of Surplus Property included negotiating the sale and disposition of surplus and obsolete WMATA property, including large numbers of used transit vehicles, for WMATA's financial benefit.

17. As part of these duties, HUNTER was responsible for choosing the method of property disposal (i.e., a public offering at auction or a negotiated sale with a single buyer), identifying and then negotiating with prospective customers on price, and accepting and verifying payment. While WMATA policy indicated a preference for public offerings/auctions and for price negotiations in line with market values, in practice HUNTER and other IRAs had little oversight from supervisors and broad discretion to choose the disposition method and pricing of disposed surplus property. This was due to, among other reasons, the relative physical isolation of HUNTER and his fellow Office of Surplus Property colleagues. The Office of Surplus Property is a free-standing warehouse building with controlled access entry located in Landover, Maryland on a large WMATA-owned campus. No other WMATA departments or functions are co-located at the Office of Surplus Property. Interviews conducted with HUNTER's supervisors revealed that HUNTER and other IRAs were granted broad discretion in their job duties and that sales data

from transactions negotiated by HUNTER and other IRAs was not tracked to determine whether pricing decisions were consistent between employees or compared to the actual market value of the asset(s) being sold. In addition, for vehicles, which constituted a large portion of WMATA's surplus property (i.e., buses, vans, and other automobiles) HUNTER and his coworkers had physical custody of, and unmonitored access to, the vehicle titles for each of these vehicles, which were stored in the Office of Surplus Property. This effectively gave HUNTER and his coworkers control over ownership of these assets.

18.   During the course of the investigation of HUNTER, investigators discovered that HUNTER was in a long-term romantic relationship with TAYLOR, who was identified as a frequent customer of the Office of Surplus Property. TAYLOR had made multiple large purchases from the Office of Surplus Property while utilizing a trade name, EMPOWERMENT BUSINESS CONSULTING ("EBC"). From summer 2018 to late 2020, EBC made six (6) separate purchases of used WMATA transit buses, 216 buses in total, from Office of Surplus Property through HUNTER, for a total acquisition cost of approximately $203,750.

19.   The WMATA terms and conditions that applied to each of the six (6) transactions between WMATA and EBC described above required payment prior to delivery of the WMATA property, and further provided that title to the property would not pass from WMATA to the buyer until payment took place. TAYLOR or her designee signed these terms and conditions for each of the six (6) aforesaid transactions.

20.   The specific language related to payment and the timing and terms of the passing of title from WMATA to the purchaser contained in the terms and conditions are set forth below [**emphasis added**]:

   "***6.1 Cash on Delivery***. *Payment in full is due from Buyer with ten (10) days of sale.*

*Buyer shall make payment prior to delivery*, *which may be scheduled as early as twenty-four (24) hours after WMATA's notification to Buyer that a shipment is ready, as provided above. Such payment shall be made in U.S. dollars and immediately available funds by certified check, cashier's check, or postal money order. Payments shall be forwarded to: Tyrone Hunter and Daniel Salzinger, 13 Washington Metropolitan Area Transit Authority, Investment Recovery Administrators, 8201 Ardwick-Ardmore Road, Landover, MD 20785. [...]* **8.0 Title and Risk of Loss**. **Title shall pass to the Buyer upon delivery or to conveyance specified by Buyer, whichever occurs first**..."

21. The investigation generally revealed that TAYLOR received, took title, and scrapped WMATA buses provided to her by HUNTER at the Officer of Surplus Property before TAYLOR paid for them. Later, at some point after TAYLOR received payment from a scrapyard for the scrapped buses, HUNTER and TAYLOR prepared falsified WMATA sales paperwork to cover up the fact that TAYLOR had already taken and scrapped buses before making any payment to WMATA, and which set the price per bus at approximately one half to one third of the amount TAYLOR had already received for the buses at a scrap yard. This sales paperwork included a payment from TAYLOR to WMATA/HUNTER for the buses at the price level that HUNTER and TAYLOR devised after payment from the scrap yard had already been received, and which ensured HUNTER and TAYLOR kept a substantial profit. Specifically, investigation revealed that: (a) from 2018 to 2020, TAYLOR had scrapped 166 of the buses she purchased from WMATA at Joseph Smith & Sons ("JSS"), a scrapyard located in Capitol Heights, Maryland, and personally received cash for each scrap transaction from JSS; and (b) in 2021, TAYLOR had scrapped the 50 remaining buses she had purchased from WMATA at Davis Industries, a scrapyard located in Lorton, Virginia, and personally received cash for each scrap transaction

from Davis Industries. Investigators interviewed employees of JSS and subpoenaed records from JSS and Davis Industries, which generally revealed that (a) TAYLOR had scrapped all of the buses she had purchased from WMATA at one of these two scrapyards; (b) TAYLOR had received cash for each transaction personally, as the scrapyard was required to retain the identification information of the party receiving the payout from the scrap transaction by state law/policy; and (c) prior to scrapping the buses at the scrap yard, TAYLOR was required by state law to prove her beneficial ownership of the property to be destroyed, which TAYLOR did by submitting the titles for each of the scrapped buses to the applicable scrapyard prior to their processing for destruction.

22.   Due to varying record-keeping policies and the dates involved, not all of the titles for all 216 buses were available to review. However, a review of representative transactions revealed that the buses were titled in the District of Columbia to WMATA and that the "title assignment by seller" section of the title of each scrapped bus contained the following information: (a) the printed name of the buyer "Empowerment Business Consulting" and signature of buyer "A Taylor" and (b) the printed name of the seller "WMATA, Tyrone Hunter" and signature of the seller "WMATA, Tyrone Hunter." The signature and handwriting of TAYLOR on these titles was consistent with multiple exemplars of TAYLOR's signature observed on various financial documents, including checks and bank account opening documents. The signature and handwriting of HUNTER on these titles was consistent with multiple exemplars of HUNTER's signature observed on various financial documents, including checks and bank account opening documents.

23.   Of note, HUNTER's signature releasing ownership on behalf of WMATA in favor of TAYLOR was observed on multiple vehicle titles that had been scrapped prior to the date on

which TAYLOR had allegedly purchased and paid for the vehicles from WMATA – indicating that HUNTER had unlawfully converted WMATA property to TAYLOR's ownership without receiving payment in advance of delivery, thus violating the WMATA terms and conditions described above. [2]

24.   An analysis of the dates on which TAYLOR actually scrapped buses at the aforesaid scrapyards versus when she allegedly purchased the buses and accepted delivery of buses based on dates and representations contained in signed WMATA transaction records is set forth below:

a.      Transaction 1, sale paperwork dated 8/21/2018, 36 scrap or surplus buses purchased for $32,000– 23 of 36 buses "purchased" on 8/21/2018 had already been scrapped by TAYLOR prior to the "purchase" date;

b.      Transaction 2, sale paperwork dated 11/29/2018, 42 scrap or surplus buses purchased for $42,000 – 41 of 42 buses "purchased" on 11/29/2018 had already been scrapped by TAYLOR prior to the "purchase" date;

c.      Transaction 3, sale paperwork dated 6/6/2019, 24 scrap or surplus buses purchased for $27,500 – 18 of 24 buses "purchased" on 6/6/2019 had already been scrapped by TAYLOR prior to the "purchase" date;

---

[2] There is currently a discrepancy as to whether HUNTER had authority to sign titles on behalf of WMATA. HUNTER was the longest tenured member of the Office of Surplus Property, and when interviewed, HUNTER's work colleagues (including multiple supervisors and co-workers) insisted that HUNTER had a limited power of attorney to sign vehicle titles on behalf of WMATA and thus was the only Office of Surplus Property employee authorized to finalize negotiated sales of vehicles by signing the vehicle titles on behalf of WMATA. HUNTER's supervisors and co-workers indicated this was the primary reason that HUNTER had to be involved in all sales involving vehicles. HUNTER himself represented in correspondence to WMATA management using his official WMATA email address that he was the only Office of Surplus Property employee that had a limited power of attorney from WMATA to execute vehicle titles on behalf of WMATA, and listed this in paperwork submitted to WMATA management in an attempt to expand his job duties and increase his salary. However, interviews conducted with WMATA's management revealed that the limited power of attorney referenced by HUNTER and his colleagues could not be located in any records and that HUNTER did not have the power to execute titles on behalf of WMATA as part of his job duties. Even if HUNTER did have authority to sign titles on WMATA's behalf, HUNTER was clearly not authorized to do so without receiving valid payment for the property being transferred.

      d.    Transaction 4, sale paperwork dated 8/5/2019, 45 scrap or surplus buses purchased for $40,500 – 40 of 45 buses "purchased" on 8/5/2019 had already been scrapped by TAYLOR prior to the "purchase" date;

      e.    Transaction 5, sale paperwork dated 10/5/2019, 21 scrap or surplus buses purchased for $21,000 – 18 of 21 buses "purchased" on 10/5/2019 had already been scrapped by TAYLOR prior to the "purchase" date; and

      f.    Transaction 6, sale paperwork dated 12/21/2020, 48 scrap or surplus buses purchased for $38,000 – none of the buses purchased were scrapped by TAYLOR prior to the "purchase date". This was the only one of the six transactions conducted by TAYLOR and HUNTER in which buses were not scrapped in advance of the "purchase date" that was listed in the WMATA sales paperwork for the buses.

25. The above pattern indicates that, in the first five of the six transactions outlined, TAYLOR unlawfully received ownership of WMATA assets without paying for them through HUNTER's intervention (i.e., signing the titles on behalf of WMATA and delivering them to TAYLOR prior to receiving payment from TAYLOR to WMATA). TAYLOR then proceeded to destroy these WMATA assets and convert them into cash for her own benefit. Analysis of a bank account opened at TD Bank in the name of EBC (the "EBC Account") in August 2018, solely owned and controlled by TAYLOR, shortly before the first "sale date" of Transaction 1 but after scrapping activity began, indicated a substantial pattern of cash deposits that are believed to be derived from the scrapping of the buses described above. These cash deposits are believed to represent a portion of the proceeds of the buses scrapped by TAYLOR, which were then used to fund checks that were used to "purchase" the assets in arrears from WMATA and cover up the embezzlement. While the sixth transaction described above did not involve the "advance

scrapping" of buses and the falsification of WMATA paperwork to reflect a falsified purchase date for already destroyed WMATA assets, it is believed that the proceeds generated from the prior five sales were used to fund the purchase of the sixth transaction, based on the fact that the only significant source of deposits reflected in the EBC Account during the relevant time period were cash deposits believed to be derived from the scrapping of other buses. TAYLOR confirmed during a proffer session with investigators (described hereinafter in more detail) that the source of funds to make each of the six bus purchase transactions was cash derived from the scrapping buses and that TAYLOR did not have another source of income that was used to fund these purchases.

26. In total, the scheme described above (six transactions) generated approximately $600,154 dollars in cash from buses purchased by TAYLOR/EBC from WMATA that were then scrapped at JSS and Davis Industries, Inc. The amount that TAYLOR/EBC paid to WMATA during the course of the scheme (which she made in connection with the backdated, falsified sales paperwork) totaled only approximately $203,750, representing a net profit to TAYLOR from the scheme of approximately $396,000. In addition to the fact that TAYLOR appeared to have financed the payments after-the-fact using the money obtained from scrapping the assets themselves, HUNTER also authorized "negotiated" sale prices for the buses TAYLOR purchased that were lower than the prices other parties paid for similar scrap buses.

27. Notably, during the period that TAYLOR was actively involved in purchasing buses, August 2018 to December 2020, WMATA records reflected that no other customer had been awarded a negotiated sale or won a WMATA receipt of offers auction for buses of any kind – only TAYLOR. TAYLOR had purchased the 216 buses during this period for an average per bus acquisition cost of approximately $940. In early 2021, WMATA instituted a new sales process

that required substantially all of its surplus property to be sold at auctions that were handled online through an independent third-party vendor, GovDeals.

28. Your affiant reviewed GovDeals records from February 2021 through July 20, 2023 (the most recent records available) and located nine (9) total sales of scrap or surplus transit buses during the relevant period, with sale dates from and including February 9, 2021 through and including September 6, 2022. The types, makes, and models were substantially similar to those purchased by TAYLOR/EBC during the years 2018-2020 – some were exactly the same model year. Four different customers made these purchases; each customer made at least two transactions, while one of these four customers made three. The total buses sold in these nine (9) transactions was approximately 181 buses, for a total acquisition cost of $431,413. The average per bus acquisition cost of these transactions was approximately $2,383 per bus – or approximately two and a half times the acquisition cost paid by TAYLOR for substantially similar property. Notably, TAYLOR did not win a single auction or negotiated sale once GovDeals was implemented.  TAYLOR indicated at a proffer session with investigators (described in more detail in the following paragraphs) that she had attempted to place bids on buses after the switch to the GovDeals auction system, but had not won any of the bids.  WMATA OIG is attempting to locate bid information submitted by TAYLOR maintained in GovDeals records.

29. Emails sent and received by HUNTER's WMATA email account (tehunter@wmata.com) from the time period of approximately December 12, 2018 to October 1, 2019[3] were previously recorded by WMATA OIG investigators in connection with their prior investigative activity. These emails were requested from WMATA OIG and reviewed by your

---

[3] WMATA policies require email retention for only a six-month period.  Because of this, the timing of the identification of TAYLOR as a subject in the investigation, and the dates of TAYLOR's conduct (August 2018-December 2020), the only records available to your affiant for emails sent or received by HUNTER's WMATA email account were contained in previously stored/recorded files in WMATA OIG's case files.

affiant. Prior to logging into any WMATA workstation, users must accept the following disclaimer: "*This is a Washington Metropolitan Area Transit Authority (Metro) computer and phone system…all communications using Metro systems and all information stored on these systems, including data stored on removable media including, but not limited to, flash memory devices and compact discs, may be monitored, intercepted, recorded, read, copied or captured in any manner and disclosed in any manner, by authorized personnel. THERE IS NO RIGHT OF PRIVACY IN THIS SYSTEM. System personnel may give to law enforcement officials any potential evidence of crime found on Metro computer systems.*"

30. During review of HUNTER's emails, which consisted of only a partial production due to the WMATA email retention policy described in footnote 3 above, investigators identified at least two emails to and from the TARGET ACCOUNT and HUNTER's WMATA email account related to the purchase by TAYLOR/EBC of buses, as well as a third relevant email involving the TARGET ACCOUNT being used to transact business with the Office of Surplus Property. These emails are described briefly below:

     a. March 2019: Your affiant observed an email sent to HUNTER by MICHAEL ANDERSON, another IRA assigned to the Office of Surplus Property. Two other Office of Surplus Property employees were also listed as addressees: DANIEL SALZIGER and JIMMY R. JOHNSON, who were also Office of Surplus Property IRAs. The subject line of the email was "auction customers" and the body of the text email contained a listing of more than one hundred email addresses (all were external, non-WMATA email addresses, and appeared to be associated with businesses or individuals). The TARGET ACCOUNT was included in the email listing. Based on context, it is believed

that this email contained a listing of customers that had received public offering solicitations from WMATA Office of Surplus Property and that the TARGET ACCOUNT was included as a recipient of these solicitations.

b. August 2019: Your affiant observed an email sent by HUNTER on the morning of Monday, August 5, 2019 from his WMATA email account to the TARGET ACCOUNT with the subject "Empowerment Receipt" that contained the following text: "Good morning, please sign your receipt and scan it back to me, thanks." TAYLOR replied from the TARGET ACCOUNT on Thursday, August 8, 2019: "Good morning, the signed receipt is attached. Have a great day! Warmest regards, Antoniette." The email chain contained as an attachment a signed receipt for property for Transaction 4 above. As described above, 24 of the 45 buses that TAYLOR allegedly purchased and acknowledged receipt for by signing the attached documentation on the date of these emails had already been destroyed by TAYLOR prior to that date. This transfer of signed paperwork is indicative of the fact that TAYLOR utilized the TARGET ACCOUNT to communicate with HUNTER in his official capacity about the aforesaid scheme, including the transfer of paperwork that was intended to cover up the theft of buses by documenting the theft as a sale after the fact.

c. October 2019: Your affiant observed an email sent by the TARGET ACCOUNT to HUNTER's WMATA email account on the early afternoon of Tuesday, October 1, 2019. The email contained no text and was a forwarded email from Andrew Dickson, who utilized the email address of

Adickson@jsmith-sons.com. Dickson is known to be a former employee of JSS who had assisted TAYLOR with some scrap transactions at JSS, as described above. The forwarded email also contained no text and was from Friday, September 2019, with the subject of "Bus Photo." The attached JPG contained a picture of a destroyed bus, believed to be located at JSS based upon the background. This communication demonstrates that TAYLOR used the TARGET ACCOUNT to communicate with JSS personnel about the disposition of stolen property, and that TAYLOR further used the TARGET ACCOUNT to forward these communications to HUNTER at least one occasion. While there is no description contained in the email body, it is believed from the context of other contemporaneous communications reviewed on the TAYLOR PHONE and other interviews conducted in this investigation that the picture sent to HUNTER from JSS by way of the TARGET ACCOUNT related to a WMATA bus that had not been properly drained of operating fluids/fuel by WMATA and had caused an accident at the JSS scrapyard when TAYLOR attempted to scrap at it JSS in fall 2019, ultimately resulting in TAYLOR being barred as a customer from JSS and resulting in TAYLOR's transition to the use of Davis Industries instead of JSS to scrap buses procured from the Office of Surplus Property.

31. As described above, records were subpoenaed from JSS and Davis Industries, respectively, related to the scrapping transactions that TAYLOR had engaged in at each of these scrapyards, as well as any communications that were made between TAYLOR, EBC, HUNTER and scrapyard personnel related to the transactions. Multiple emails that were sent to and from

the TARGET ACCOUNT were identified in communication records provided by Davis Industries personnel, indicating that TAYLOR used the TARGET ACCOUNT to send and receive communications related to the embezzlement/scrapping scheme with Davis Industries (an unknowing third party participant in the activity).

32.   On June 16, 2023, TAYLOR, assisted by counsel, agreed to a reverse proffer session with investigators from the FBI and the United States Attorney's Office for the District of Columbia ("USAO-DC"). At the reverse proffer, TAYLOR, in the presence of her counsel, was presented with significant portions of the evidence that had been assembled by investigators in connection with the embezzlement and bribery investigations involving TAYLOR and HUNTER. The USAO-DC offered TAYLOR the opportunity to cooperate with the investigation and to assist investigators in understanding both TAYLOR's role in the aforesaid schemes and the role TAYLOR played in possible additional criminal fraudulent conduct.

33.   TAYLOR subsequently agreed to participate in debriefing sessions with investigators and attorneys from the FBI and USAO-DC on July 14, 2023 and July 19, 2023. TAYLOR confirmed that she had used the TARGET ACCOUNT to send and receive communications to and from HUNTER in his official capacity as a WMATA employee about the aforesaid Office of Surplus Property transactions in which TAYLOR had been involved. TAYLOR further confirmed that she had used the TARGET ACCOUNT to communicate with other parties related to her scheme, including information related to the disposition of proceeds generated from the scheme (including the emails between TAYLOR, JSS and Davis Industries personnel described above).

*Other Criminal Conduct/Schemes*

34.   In addition, TAYLOR described utilizing the TARGET ACCOUNT to engage in

other, unrelated criminal fraud schemes during the course of these sessions. Generally, these schemes are outlined in the following paragraphs, including a brief description of the mechanics of each scheme and a description of how the TARGET ACCOUNT was utilized to communicate about or in furtherance of each scheme.

35. TAYLOR had been involved in creating and filing fraudulent PPP loan applications on behalf of knowing third-party recipients. TAYLOR estimated that she had successfully filed at least twenty to thirty fraudulent PPP loans, likely totaling over $500,000 in total loan proceeds generated, and had received kickbacks from the recipients of the fraudulent loans totaling $100,000 in the form of cash, Cash App payments, and checks. TAYLOR had used the TARGET ACCOUNT to communicate with various co-conspirators in connection with the filing of these applications and receiving the above-described kickbacks. For example, TAYLOR would request the recipients/co-conspirators send information related to their loans to the TARGET ACCOUNT, including copies of bank statements and actual employment information. Frequently, TAYLOR would use PDF editing software to alter information that was sent to the TARGET ACCOUNT by these individuals (for example, changing the dates or amounts reflected on bank statements sent to the TARGET ACCOUNT such that an individual would appear to qualify for a PPP loan to which said individual was not otherwise entitled). TAYLOR's co-conspirators in these schemes included the knowing third-party loan recipients, as well as other associates of TAYLOR who would recruit third-party loan recipients from their personal networks and refer them to TAYLOR, who would then use the names and identifiers of these individuals to generate fraudulent PPP loans for their benefit. In return, TAYLOR paid a portion of the kickback she received from the applicable fraudulent loan to the recruiter as a referral fee.

36. TAYLOR had been involved in creating and filing fraudulent tax returns with the

Internal Revenue Service on behalf of knowing third-party recipients and receiving a kickback from the fraudulent proceeds received by the third-party recipients. Similar to the PPP loan application scheme, TAYLOR had been paid in the form of cash, Cash App transfers and checks. TAYLOR had used the TARGET ACCOUNT to communicate with various co-conspirators in connection with the filing of these applications and receiving the above-described kickbacks. For example, TAYLOR would request via text message that the recipients/co-conspirators send information related to their employment, prior tax filing history, and other documentation to the TARGET ACCOUNT. TAYLOR would then review the information provided and submit adjusted (i.e., fraudulent) information in tax returns filed on behalf of the recipients/co-conspirators in order to ensure the recipients/co-conspirators received larger tax return refunds than said recipients/co-conspirators were otherwise entitled. TAYLOR estimated that she had created and filed fraudulent tax returns for approximately seven to eight different individuals and had filed fraudulent returns in more than one tax year for at least some of these individuals. TAYLOR had received kickbacks from each recipient of several thousand dollars for each fraudulent return filed.

37. TAYLOR had been involved in creating and filing fraudulent unemployment benefit claims with the State of Maryland on behalf of knowing third-party recipients. Among other methods, TAYLOR would fill false unemployment claims with the State of Maryland on behalf of these third-party recipients, including representing that said individuals had been employed by EBC and that their employment had been terminated, thus entitling the recipients to state unemployment benefits. In fact, none of the various individuals for whom TAYLOR filed claims had ever been employed by or paid wages by EBC or TAYLOR. TAYLOR had used the TARGET ACCOUNT to communicate with various co-conspirators in connection with the filing

of these applications and receiving the above-described kickbacks. TAYLOR had used the TARGET ACCOUNT to receive various requested information (employment history, personal identity information) related to the scheme from recipients/co-conspirators. This information was then utilized by TAYLOR to log into the Maryland Division of Unemployment Insurance website and submit the fraudulent applications online on behalf of the aforesaid third-party recipients. The third-party recipients would then utilize the fraudulently created accounts to access the same website and file weekly online claims for unemployment benefits.  TAYLOR estimated that she had been involved in creating and filing fraudulent unemployment benefit claims with the State of Maryland for approximately ten individuals, and estimated that she had received approximately $1,000 in kickbacks from each of the ten individuals (i.e., $10,000 in total) as part of the scheme.

*Corroboration of Other Criminal Conduct/Schemes*

38. Searches conducted of the TAYLOR DEVICE pursuant to the previously issued warrants corroborated TAYLOR's statements made at the debriefing. For example, investigators located multiple examples in which TAYLOR had received payments from previously unknown third parties via cash hand-offs, Cash App payments, and checks.  Review of text messages contained on the TAYLOR PHONE revealed that TAYLOR had: (a) coordinated multiple meetings with individuals to receive cash, typically meeting in the Maryland area; (b) coordinated receiving checks by mail from individuals located in North Carolina; and (c) requested and received Cash App payments from multiple individuals.

39. Further review of the context of the communications surrounding these payments revealed that these payments were all preceded by text message discussions in which TAYLOR discussed, and actually took steps to file, PPP loans, tax filings, and unemployment claims on

behalf of the individuals from whom the payments were received. These filings contained fraudulent information such that the loan/tax return/unemployment claim would be larger than the co-conspirator recipient would otherwise lawfully be entitled. In return for these filings, TAYLOR requested and received a kickback from the loan/tax return/unemployment claim payable to TAYLOR in cash, check or Cash App. Generally, these communications followed a pattern in which TAYLOR would solicit and receive information and documents via text message on the TAYLOR PHONE and via email to the TARGET ACCOUNT, and then altered the information provided (i.e., using PDF editing software to change dates/amounts on bank statements) or submitted false information that did not match the actual information provided on tax returns or unemployment claims in order to generate fraudulent pay-outs for participants in the scheme. A representative example of these communication patterns is set forth below.

40.   Your affiant located a text message on the TAYLOR PHONE sent from TAYLOR to phone number 202-677-1505, contact name of RENEE BERGER ("BERGER") on March 9, 2021 that stated: "Your application has been submitted for the loan amount of $16,572. The processing and service fees for that amount is $5,500. You will profit $11,072. I normally submit for 10k and you would have ended up with 7.5k."

41.   Review of contextual communications to determine the purpose of the processing and service fees referenced by TAYLOR revealed that on March 9, 2021, BERGER had texted TAYLOR: Hey I'm interested in the PPP loan." TAYLOR responded: "Hey honey, ok." Several minutes, later, TAYLOR sent BERGER a text message (produced in the below screenshot) containing a form related to obtaining a PPP loan and requesting certain information. In particular, the form included a prompt for "business name" and stated below "if you don't have a business, I will create one for you" (emphasis added by red box). It is noted that TAYLOR sent

the TARGET ACCOUNT (Antoniette.taylor@yahoo.com) to BERGER as a means of providing

some of the requested documentation (i.e., bank statement, voided check).



42.  BERGER responded several minutes later with the requested information, including

her date of birth, social security number and home address. Review of law enforcement databases

confirmed that an individual with the same identifiers lived at the same address and utilized the

above phone number. Of particular interest, BERGER responded to TAYLOR: "Create a

business" (emphasis added with red box in the above screenshot). Subsequently, TAYLOR sent

BERGER a screenshot of a "business loan application" being submitted on the website of MBE

Capital Partners, a known PPP loan lender. The loan listed BERGER as being an eligible self-

employed individual employed in a Home Health Care Service headquartered at the home address listed above, and listed the establishment date of her business as December 3, 2018.

43. On March 30, 2021, TAYLOR texted BERGER a screenshot of an email from MBE Capital Partners stating that BERGER's loan had been "finalized" and that funds would be disbursed on BERGER's loan "within 5 to 7 business days."

44. Your affiant requested and received wage records for the state of Maryland for BERGER that revealed that for tax year 2019, BERGER had earned approximately $157.00 working for Contemporary Services Corporation (CSC), known to be a crowd management services company that provides staffing at arenas, stadiums, and other event spaces. In tax year 2020, BERGER had earned approximately $18,817.19 working for Robin Automotive, Inc., believed to be an auto shop/oil change service station located in Maryland. Open source databases, open source research, and State of Maryland incorporation records did not reflect the operation of a home healthcare business, or any business, by BERGER at the listed address (or any address).

45. Based on my training, experience, and knowledge of this investigation, there is probable cause to believe that TAYLOR was engaged in multiple fraudulent schemes, and that the TARGET ACCOUNT was used to communicate about such schemes with TAYLOR's various co-conspirators and to facilitate the commission of said schemes. Furthermore, the TARGET ACCOUNT is likely to contain evidence of said schemes, including the unaltered copies of documents that TAYLOR later altered and submitted to various banking institutions in order to generate PPP loan proceeds to which the recipients of said loans were not lawfully entitled, state unemployment benefits to which the recipients were not entitled, and federal tax refunds to which the recipients were not entitled.

46. A preservation request was submitted to PROVIDER for the TARGET ACCOUNT

on June 16, 2023.  A second preservation request was submitted to Provider for the TARGET

ACCOUNT on September 15, 2023, which was operative for 90 days.

## **BACKGROUND CONCERNING PROVIDER'S ACCOUNT**

47.  PROVIDER is the provider of the internet-based account(s) identified  by the

TARGET ACCOUNT.

48.  PROVIDER provides its subscribers internet-based accounts that allow them to

send, receive, and store e-mails online. PROVIDER accounts are typically identified by a single

username, which serves as the subscriber's default e-mail address, but which can also function

as a subscriber's username for other PROVIDER services, such as instant messages and remote

photo or file storage.

49.  Based on my training and experience, I know that PROVIDER allows subscribers

to obtain accounts by registering on PROVIDER's website. During the registration process,

PROVIDER asks subscribers to create a username and password, and to provide basic personal

information such as a name, an alternate e-mail address for backup purposes, a phone number,

and in some cases a means of payment. PROVIDER typically does not verify subscriber names.

However, PROVIDER does verify the e-mail address or phone number provided.

50.  Once a subscriber has registered an account, PROVIDER provides e-mail services

that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic

address books or contact lists, and all of those folders are linked to the subscriber's username.

PROVIDER subscribers can also use that same username or account in connection with other

services provided by PROVIDER.[4]

---

[4] Here, PROVIDER's other services include e-mail, contact list, notes, chat, and other
services as noted generically above. It provides the branded services Yahoo! groups (a listserv and
bulletin board service, which users can opt into), and Yahoo! Messenger (an instant messaging

51.  In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material. For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

52.  Thus, a subscriber's PROVIDER account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing, voice calls, video chats, SMS text messaging and social networking. Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber. Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time. Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers.  Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

53.  Based on my training and experience, I know that providers such as PROVIDER

---

service, which users can opt into). Yahoo does not currently provide a standalone document storage service, but its smartphone application has designated "documents" functions that operate through Yahoo's e-mail storage.

also collect and maintain information about their subscribers, including information about their use of PROVIDER services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

54.  Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my

training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

55. PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

56. Based on my training and experience, I know that providers such as PROVIDER

use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

57. Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

58. Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the

provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

59.  In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities. As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by PROVIDER can show how and when the account was accessed or used. For example,

providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[5]

60.   Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-

---

[5] At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

61.   In this case, I seek this electronic information because the information connected to the use of the Provider account(s) may lead to the discovery of additional evidence, including but not limited to, stored communications or other documents that provide evidence of, or which were used in furtherance of, the crimes under investigation.

### <u>REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS</u>

62.   I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Risa Berkower, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## <u>CONCLUSION</u>

63. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Garrett S. Churchill
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) by telephone on March 28, 2024.

_____
HONORABLE MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I,_____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER. The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.      such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____      _____
            Date                                      Signature